Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

DRIVERS AND CHAUFFEURS LOCAL UNION NO. 816, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent.

United States District Court
S. D. New York.
Nov. 2, 1959.

James M. Fitzpatrick and Raymond J. Malloy, Washington, D. C., Attys., N. L. R. B., for petitioner.

Cohen & Weiss, New York City, for respondent. Jack Last, New York City, of counsel.

Charles Barnhill, Chicago, Ill., for charging party, Montgomery Ward & Co.

RYAN, Chief Judge.

This proceeding comes to us on the petition of Ivan C. McLeod, Regional Director of the Second Region of the National Labor Relations Board, filed under Section 10(l) of the National Labor Relations Act, as amended, 29 U.S. C.A. § 141 et seq., after a preliminary investigation, and it seeks a temporary injunction pending the final disposition of charges filed by Montgomery Ward and Company. The charges allege that respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(b) (4) (A), (B) and (D) of the Act.

It is alleged that the unfair labor practices charged were in part committed at 75 Varick Street, New York City, in this judicial district. Respondent, Local Union No. 816, is a labor organization within the meaning of the act, functioning and acting within this district. We conclude that this court has jurisdiction.

The Act empowers the Board, after the filing of appropriate charges, to hear and determine complaints that employers or labor organizations have engaged in unfair labor practices within the meaning of the Act (Sections 10(a), (b) and (c) of the Act).

To restore or preserve the status quo pending final disposition by the Board and "to protect the public welfare", it was provided in section 10(l) of the Act that:

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 8(b), * * * the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper * * *".

We find there is reasonable cause to believe that a violation of the Act, as charged, has been committed and conclude that equitable relief is just and proper. We are not now called upon to finally determine the charges are true or whether a violation has been committed. The petition alleges that the unfair labor practices with which respondent is charged have impeded and disrupted and tend to impede and disrupt the business of Montgomery Ward and we so find.

Montgomery Ward operates retail stores, offices and distribution centers throughout the country. Its distribution

center for women's apparel and other merchandise (called New York Fashion Pool) is located at 75 Varick Street, New York City, where the women's apparel purchased for resale is received, processed and shipped to stores throughout the country. It is engaged in interstate commerce.

The following facts, which led to the charged unfair practices, do not appear to be in dispute.

Montgomery Ward has no trucks of its own at the Fashion Pool. It contracts with various motor carriers to supply vehicles and drivers for this operation. One of these contracts, with Metropolitan Motorways Inc. (a subsidiary of the Hertz Corp.), was in effect on August 31, 1959. Under this contract, Motorways supplied two trucks and drivers to Montgomery Ward for use at the Fashion Pool. The two drivers who manned these trucks were members of respondent union which had a collective bargaining agreement with Motorways covering the employment of these two men. At midnight on August 31, 1959, this contract was terminated, pursuant to a clause in the contract and respondent's men were informed by Motorways that their services were no longer required.

On September 1, 1959 Sidel Truck Leasing Corp. under a new contract with Montgomery Ward began to supply two trucks and two drivers to replace those heretofore supplied by Motorways. Sidel had a bargaining agreement with another local and the drivers supplied were members of that local. A business agent of respondent and the two men who had been let go by Motorways appeared on that day at the Montgomery Ward's Varick Street office and demanded that the two men be rehired to drive the trucks of Sidel and be paid for the day they were losing. An executive of Montgomery Ward took the position that the men had never been employees of Montgomery Ward, that they had no rights as employees, and that Montgomery Ward had no duty to employ them.

Respondent also contacted Sidel and demanded that the two men, who had previously worked for Motorways, be employed by Sidel in the same capacity. Sidel, after consulting the local with which it had signed, refused to do so.

On September 2, 1959, picketing began both at Montgomery Ward's Varick Street address and also at the parking lot where Sidel kept its trucks. Employees of Montgomery Ward, Sidel and other employees were induced not to cross the picket lines and as a result shipments from Montgomery Ward's New York Fashion Pool were either discontinued or seriously curtailed.

Respondent does not deny the factual details. Respondent claims, however, that this picketing was not unlawful since Montgomery Ward was either the primary employer of these discharged drivers or at least that Montgomery Ward and the discharged drivers were so intertwined with respect to employment that Montgomery Ward should not and could not be protected by Section 8(b) (4) of the Act.

Respondent further claims that if Montgomery Ward was a party to the dispute, or was not a neutral or an innocent bystander then the Act affords it no protection. With this latter premise, we agree. Douds v. Metropolitan Federation of Architects, Engineers, Chemists and Technicians Local 231, D. C., 75 F.Supp. 672. The status of Montgomery Ward in this situation is the pivotal point to be decided here. We must determine whether the picketing was properly exercised as against Montgomery Ward, and that depends on whether Montgomery Ward occupied the position of actual employer of the two drivers or a relationship existed which placed Montgomery Ward in the role of employer.

The evidence produced by respondent and upon which the court is asked to deny the granting of a temporary injunction is substantially as follows: The two drivers, Weseley and Stern, had been

performing services at the depot of Montgomery Ward for fifteen and eight years, respectively. Although the contracts with Montgomery Ward had been signed with respect to one employee with three and with respect to the other employee with two separate trucking corporations, the two men continued performing the same services. They were concededly on the payroll of the several trucking corporations, but when one contract ended, they always remained on the job and became, at least nominal, employees of the new contracting party. The men signed a work or time sheet at Varick Street each morning and the following morning they also recorded the time they had quit work the night before. The Montgomery Ward dispatchers told them when to make deliveries. The drivers also had the privilege of a special discount on articles purchased from Montgomery Ward.

Stern testified that he was originally "hired" by Montgomery Ward in 1951. The union, he testified, had sent him to 75 Varick Street and there he was told by the dispatcher to go to the garage of Rentways, the contracting carrier at that time, and pick up his truck.

Respondent also introduced the collective bargaining agreement between Metropolitan Motorways and Respondent. This stated the employer's name as "Motorways, Inc. F/AC Montgomery Ward & Co.". The "F/AC" literally meant "for the account of".

The trucks in use under these contracts had painted on the sides of the body the emblem of Montgomery Ward, in accordance with specifications supplied by Montgomery Ward.

However, other testimony produced at the hearing (mostly by respondent's own witness) gave further light on the actual situation.

Respondent produced Mr. Giles Wanamaker, a vice president of the Hertz corporation and the individual who had signed the collective bargaining agreement between Motorways, Inc. and the respondent union. It is on this agreement that the symbol "F/AC" appears. Mr. Wanamaker testified that "F/AC" was used not in its usual sense but was used merely to identify the collective bargaining agreement with the specific drivers involved in the agreement. Since Motorways had many drivers from many different unions working for it, some symbol was found to be necessary to separately relate the drivers to a particular agreement. "F/AC" was simply the symbol used for this purpose. There was absolutely no attempt, intent or purpose to signify that Motorways was signing for Montgomery Ward in any capacity. "F/AC" was used here merely to limit and identify the agreement to those particular trucks and drivers used by Montgomery Ward.

Respondent relies heavily on the continued association of the drivers with Montgomery Ward despite the termination of contracts with three separate trucking corporations. They offer no evidence concerning the details of the hiring of these men by Metropolitan Motorways. Respondent simply shows that the two drivers were in the "employ" of Motorways and reason from this that they must have been placed there by arrangements of their "true" employer, Montgomery Ward. We do not see how this result logically follows and we hold the respondent has not carried the burden of proof on this point. This is especially true in the light of Wanamaker's testimony that there was no employment arrangement between Montgomery Ward and Motorways concerning these two men and that to the best of his (Wanamaker's) knowledge, a dispatcher had obtained the men for Motorways.

Assuming that Montgomery Ward had first contacted Stern in 1951 and sent him to Rentways, there is no evidence of an employment relationship especially after the time the Rentway contract was replaced by one with Motorways. In fact, the testimony of Wanamaker, respondent's own witness, expressly denies any arrangement between Montgomery

Ward and Motorways which would place Montgomery Ward in an employer relationship with these men.

The remaining purported indicia of employment (discount privileges, signatures on work sheet, directions from Montgomery Ward dispatchers and Montgomery Ward's name on the vehicles) do not constitute the employer-employee relationship present in Local No. 24, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. National Labor Relations Board, 105 U.S.App.D.C. 271, 266 F.2d 675.

■ In view of respondent's failure to sustain the burden of proof and the overwhelming evidence that there was no legal relationship of employer-employee in this situation, we hold that Montgomery Ward is a neutral party entitled to the protection of Section 8(b) (4) (A) and (B).

■ The Board also charges a violation of section 8(b) (4) (D) of the Act which prohibits

"a labor organization or its agents * * * to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment * * * to perform any services, where an object thereof is * * * forcing or requiring any employer to assign particular work to employees in a particular labor organization * * * rather than to employees in another labor organization * * *".

This section prohibits a union from forcing any employer to assign members of a particular labor organization tasks already assigned to members of some other union.

Since we hold that Montgomery Ward is not an employer but a neutral in this dispute and would have no power to assign particular work, and since Montgomery Ward is the only charging party, Section 8(b) (4) (D) does not apply.

The prayer of the petition for injunctive relief pending the final adjudication of the Board with respect to the charges now before us is granted; settle order on notice.